IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PARKE BANK, et al.,                    :    CIVIL ACTION
                                       :    NO. 10-2368
        Plaintiffs,                    :
                                       :
     v.                                :
                                       :
BANK OF AMERICA, N.A.,                 :
                                       :
        Defendant.                     :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              JANUARY 19, 2012


TABLE OF CONTENTS

I.    BACKGROUND............................................... 2
      A.   Lease of the Premises.............................. 2
      B.   Consent to Sublease................................ 4
      C.   Blockbuster Sublease............................... 5
      D.   Restoration Obligation and New Blockbuster Lease..... 6
II.   PROCEDURAL HISTORY....................................... 8
III.  STANDARD OF REVIEW...................................... 10
IV.   DISCUSSION.............................................. 12
      A.   Interpretation of the Lease and Consent to Sublease. 12
      B.   Bank of America's Restoration Obligation........... 20
V.    CONCLUSION............................................. 23

        Plaintiffs' Motion for Partial Summary Judgment and

Defendant's Cross-Motion for Summary Judgment in this breach-of-

contract action are before the Court. The principal issue here

is whether a subsequent agreement between a landlord, tenant,

and subtenant excused the tenant's restoration obligation under
the original lease. For the reasons that follow, the Court will
deny Plaintiffs' motion for partial summary judgment and grant
Defendant's cross-motion for summary judgment.


**I.   BACKGROUND**

This dispute arises out of three separate but related
contracts. The facts are largely undisputed and summarized as
follows.


A.   Lease of the Premises

On April 20, 1988, Joseph Pacitti, as landlord,
entered into a lease with the Connecticut National Bank ("CNB"),
as tenant, for a portion of the Vernon Park Center located at
129 Talcottville Road, Vernon, Connecticut (the "Premises").
Compl. ¶ 10, ECF No. 1; Lease for Vernon Park Center 1-2, Compl.
Ex. A [hereinafter "Lease"]. The base term of the Lease was for
twenty years to commence on December 1, 1988. Lease 3.
Plaintiffs acquired Mr. Pacitti's interest as landlord, and Bank
of America, N.A., is the successor in interest to CNB as tenant.[1]
Compl. ¶¶ 10-15. For ease of reference, the Court will refer to

---

[1]     Mr. Pacitti assigned his interest to Plaintiff Vernon
Park Plaza, a limited liability company of which he is a member.
Compl. ¶¶ 3, 11. Vernon Park Plaza assigned its interest to
Parke Bank by virtue of an open-ended mortgage. Compl. ¶ 12.

Mr. Pacitti, Parke Bank, and Vernon Park Plaza, L.L.C., as

"Parke Bank" and to CNB, Fleet National Bank (CNB's successor in

interest), and Bank of America, N.A., as "Bank of America."

Before delivery to Bank of America, Parke Bank, at its

own expense, outfitted the Premises for use as a bank branch.

Compl. ¶ 16; Lease 3-5; Pacitti Dep. 71:23-72:7, Apr. 20, 2011.

Upon its expiration, the Lease required Bank of America to

surrender the Premises as a bank branch:

> Upon any termination or expiration of this Lease,
> [Bank of America] shall surrender the Premises in the
> same condition as existed at the Commencement Date,
> except for normal wear and tear and damage caused by
> the elements, casualty, or any other cause for which
> [Bank of America] might be liable, except that [Bank
> of America] shall have the right but not the
> obligation to remove any and all improvements and
> alterations made to the Premises by [Bank of America]
> or at [Bank of America's] expense.

Lease § 22(f). With regard to assignment or subletting, the

Lease provides:

> Notwithstanding anything contained herein, it is
> agreed and understood that [Bank of America] shall
> have the right to assign this Lease or to sublet the
> [Premises] with the consent of [Parke Bank] which
> consent shall not be unreasonably withheld. Any such
> assignment or subletting shall in no way relieve [Bank
> of America] from any of its obligations and
> responsibilities under any of the terms and covenants
> of the Lease.

Id. § 13. The lease expired on July 9, 2010. Compl. ¶ 18; Third-

Party Compl. ¶ 9, ECF No. 8.

B.    Consent to Sublease

In 1996, Bank of America conducted negotiations with Blockbuster Videos, Inc. ("Blockbuster") regarding a possible sublease of the Premises. Def.'s Mem. in Supp. of Resp. in Opp'n 4, ECF No. 35. Bank of America sought Parke Bank's consent to sublease. Letter from Benjamin Robinson to Joseph Pacitti (Aug. 1996), Def.'s Mem. in Supp. of Resp. in Opp'n Ex. C. On June 24, 1997, after several exchanges between the parties,[2] Parke Bank, Bank of America, and Blockbuster executed a Consent to Sublease and Non-Disturbance Agreement ("Consent to Sublease"). Consent to Sublease 1, Def.'s Mem. in Supp. of Resp. in Opp'n Ex. E. As is relevant here, the Consent to Sublease provides:

> In the event of a termination of the [the Lease] prior to the termination of the Sublease, the Sublease shall continue in full force and effect as a direct lease between [Parke Bank], or the successor or assign of [Parke Bank], and Tenant, upon, and subject to, all of the terms, covenants and conditions of the Sublease for the balance of the terms thereof remaining, including any extensions therein provided.

Consent to Sublease ¶ G.

---

[2]    Parke Bank initially resisted Bank of America's efforts to sublet the Premises because it wished to sell the property. Pacitti Dep. 99:20-100:20. Parke Bank sought payment of $800,000, plus a buyout of a $3.9 million mortgage obligation. Id. at 101:5-8. Bank of America advised Parke Bank that it believed Parke Bank was unreasonably withholding its consent to sublet under the Lease by using the Consent to Sublease as leverage for the buyout proposal. Letter from Gail E. McCann, Esq., to William C. Longa, Esq. 1-2 (Oct. 29, 1996), Def.'s Mem. in Supp. of Resp. in Opp'n Ex. D. Parke Bank later consented to the Blockbuster Sublease.

C.   <u>Blockbuster Sublease</u>

On the same day the parties executed the Consent to Sublease, Bank of America, as sublessor, and Blockbuster, as sublessee, executed a sublease ("Blockbuster Sublease"), a copy of which was attached to the Consent to Sublease, for a portion of the Premises.[3] Blockbuster Sublease 1-2, Def.'s Mem. in Supp. of Resp. in Opp'n Ex. F. The Blockbuster Sublease commenced on "the date . . . upon which [the Premises] is delivered to Blockbuster" and terminated "at midnight on the last day of the thirteenth . . . Lease Year" after the commencement date. Blockbuster Sublease art. 1(A). As required by the Blockbuster Sublease, Bank of America and Blockbuster agreed that the Blockbuster Sublease commenced on July 28, 1997, and that the primary term would expire on July 31, 2010. Agreement 1, Def.'s Mem. in Supp. of Resp. in Opp'n Ex. G.

The Blockbuster Sublease provided for a restoration obligation different from that of the Lease:

> Blockbuster shall, upon the expiration of the Term granted herein, or any earlier termination of this [Sublease] for any cause, surrender [the Premises] to

---

[3]     The evidence of record indicates that the portion of the Premises not leased to Blockbuster, a drive-through teller window, was never modified. Although Mr. Pacitti testified that the window was "non-functional," Pacitti Dep. 178:11, an agent of Bank of America confirmed that the window was covered with a metal louvered door in gray that matche[s] the rest of the exterior of the building" and that the "window is not bricked up in any manner," Pizzanello Aff. ¶¶ 6-7.

> [Bank of America], including, without limitation, all
> building apparatus and equipment then upon [the
> Premises], and all alterations, improvements and other
> additions which may be made or installed by either
> party to, in, upon or about [the Premises], other than
> [Blockbuster's] Property (which shall remain the
> property of [Blockbuster] as provided in Article 10
> hereof, unless they remain on [the Premises] on the
> day after the expiration or earlier termination of
> this [Sublease], in which case they shall be deemed
> abandoned and may be removed by [Bank of America]),
> broom clean, without any damage, injury or disturbance
> thereto (reasonable wear and tear, loss due to
> condemnation, and damage due to casualty excepted), or
> payment therefor.

Blockbuster Sublease art. 24. Finally, the parties agreed that

Blockbuster "shall and may peaceably and quietly have, hold and

enjoy [the Premises] and improvements thereon during the term of

[the Sublease]." Blockbuster Sublease art. 33(A).


  D. <u>Restoration Obligation and New Blockbuster Lease</u>

   Before the expiration of the Lease term, Parke Bank

demanded that Bank of America perform its restoration obligation

under the Lease. Compl. ¶ 22. Parke Bank estimates that the cost

of restoring the Premises for use as a bank branch will be

approximately $1.6 million. Compl. ¶ 23. An agent for Bank of

America notified Parke Bank that Bank of America "does not have

a legal obligation to restore [the Premises] to its original

condition as a bank branch." Letter from Jennifer N. Pizzanello

to Joseph Pacitti (Jan. 28, 2010), Compl. Ex. B.

After this action commenced, Parke Bank, as landlord, entered into a lease of the Premises with Blockbuster, as tenant. Agreement 1, Def.'s Mem. in Supp. of Resp. in Opp'n Ex. J [hereinafter "New Blockbuster Lease"]. The New Blockbuster Lease purports to be executed on July 9, 2010.[4]

In the New Blockbuster Lease, Parke Bank and Blockbuster make the following recitals:

> WHEREAS, in June 1997, [Parke Bank] consented to a "Sub-Lease" between [Bank of America] and [Blockbuster] for [the Premises] for a period set to expire on July 9, 2010 . . .;
>
> . . .
>
> WHEREAS, [Blockbuster's] tenancy in the leased premises terminates simultaneously with the termination of Bank of America's tenancy therein; and
>
> WHEREAS, [Parke Bank] and [Blockbuster] now mutually wish to commence a new month-to-month tenancy in [the Premises] following the termination of Bank of America's tenancy, subject to the terms and conditions of this Agreement; and
>
> WHEREAS, Parke Bank and Blockbuster are entering into this Agreement for the purpose of enabling Parke Bank to lease out [the Premises] while [Parke Bank] awaits Bank of America's performance of its

---

[4]     Parke Bank and Bank of America dispute the date that the New Blockbuster Lease commenced. Parke Bank contends that the New Blockbuster Lease was executed "as of" July 9, 2010, and memorialized the parties' prior oral agreement. Pls.' Reply Mem. in Supp. of Mot. for Partial Summ. J. 9. Bank of America, however, contends that the agreement was "backdated" to July 9, 2010, because negotiations between Parke Bank and Blockbuster likely did not commence until after July 9, 2010, and Blockbuster did not execute the New Blockbuster Lease until July 27, 2010. Def.'s Mem. in Supp. of Resp. in Opp'n 8.

> obligations under the Lease, including, but not limited to Bank of America's restoration of the leased premises to the condition they were in at the commencement of the Lease . . . .

New Blockbuster Lease 1. The parties agreed that the Blockbuster Sublease would expire on July 9, 2010. Id. ¶ 1. Furthermore, the parties agreed that Blockbuster would continue to use the Premises from July 10, 2010, "under the same terms and conditions as are set forth in the [Blockbuster Sublease]" with certain "exceptions." Id. ¶ 2. Among those exceptions, "[n]othing contained in [the New Blockbuster Lease] is intended to nor shall be construed to release or relieve Bank of America from any of its obligations under the Lease." Id. ¶ 2(D).

Bank of America has not taken any measures to restore the Premises to its original condition for use as a bank branch. Pizzanello Dep. 70:3-72:7.

## II. PROCEDURAL HISTORY

On May 19, 2010, Parke Bank filed a complaint against Bank of America that asserts one count for breach of contract by anticipatory repudiation and one count for a declaratory judgment that Bank of America is required to restore the Premises for use as a bank branch. Compl. 5-7.

On June 16, 2010, Bank of America answered, Def.'s Answer, ECF No. 5, and filed a third-party complaint against Blockbuster that asserts one count of indemnification and one

count for a declaratory judgment, Third Party Compl. 4-6, ECF No. 8. However, the Court stayed Bank of America's third-party claims against Blockbuster after Blockbuster filed a notice of bankruptcy proceedings.[5] See 11 U.S.C. § 362(a) (2006 & Supp. IV 2011); Notice of Bankruptcy 1, Sept. 27, 2010, ECF No. 16; Order, Oct. 6, 2010, ECF No. 19.

Following an initial pretrial conference, the Court bifurcated the issues of liability and damages and directed the parties, at that point, to conduct discovery only relating to the issue of liability. Scheduling Order 2 n.3, ECF No. 24.

On May 10, 2011, Parke Bank moved for partial summary judgment on the issue of liability. Pls.' Mot. for Partial Summ J., ECF No. 31. Bank of America responded and filed a cross-motion for summary judgment. Def.'s Resp. in Opp'n and Cross-Mot. for Summ. J., ECF No. 34. Parke Bank and Bank of America each replied. Pls.' Reply Mem. in Supp. of Mot. for Partial Summ. J., ECF No. 36; Def.'s Reply Mem. in Supp. of Mot. for Summ. J., ECF No. 37. The Court has considered the motions and supportive filings, and the matter is now ripe for disposition.

---

[5]       As a result of the stay, the rights and obligations of Blockbuster vis-à-vis Bank of America and Parke Bank are not the subject of this proceeding.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

10

"Summary judgment may be granted based on the interpretation of a contract only if the contract is so clear that it can be read only one way." Battaglia v. McKendry, 233 F.3d 720, 722 (3d Cir. 2000) (internal quotation marks removed). Where the meaning of the terms of a contract "is unambiguous and can be interpreted only one way, the court interprets that contract as a matter of law." Allied Erecting & Dismantling, Co. v. USX Corp., 249 F.3d 191, 201 (3d Cir. 2001) (internal quotation marks removed). But where "the contract as a whole is susceptible to more than one reading," the fact-finder must resolve the matter. Id. at 201; see also LMK Enters., Inc. v. Sun Oil Co., 860 A.2d 1229, 1232 (Conn. App. Ct. 2004) ("Where contract language is clear and unambiguous, the question of contractual intent presents a question of law for the court; otherwise, the question of contractual intent is one of fact for the ultimate fact finder.").[6]

---

[6]     The Blockbuster Sublease provides that the "laws of the state in which [the Premises are] located" rules, which, in this case, is Connecticut. Blockbuster Sublease art. 45. Both parties relied on Connecticut law in their briefing, and the Court, too, will apply Connecticut substantive law. See Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 170 (3d Cir. 2011) ("In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits."); Nationwide Mut. Ins. Co. v. West, 807 A.2d 916, 920 (Pa. Super. Ct. 2002) ("In contract disputes, Pennsylvania courts generally honor the parties' choice of law provisions.").

**IV.  DISCUSSION**

Parke Bank argues that Bank of America breached the terms of the Lease because Bank of America failed to restore the Premises for use as a bank branch. Bank of America does not dispute that the Lease imposed a restoration obligation or Bank of America did not restore the Premises. Bank of America argues, however, that it is not in breach of the Lease because the subsequent Consent to Sublease excused the restoration obligation on the condition that the Blockbuster Sublease terminated after the Lease. Therefore, the Court must determine (1) whether the Consent to Sublease conditionally excused Bank of America's restoration obligation and, if so, (2) whether that condition was met.

A.    Interpretation of the Lease and Consent to Sublease

A party asserting breach of contract under Connecticut law must show (1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party; and (4) damages. E.g., Chiulli v. Zola, 905 A.2d 1236, 1243 (Conn. App. Ct. 2006). Parties to a contract may alter the terms of that contract by entering into a subsequent contract. Manzin v. United Bank & Trust Co., 506 A.2d 169, 171 (Conn. App. Ct. 1986). And the terms of a lease are interpreted according to the

12

law of contract. See, e.g., In re Edgewood Park Junior College, Inc., 192 A. 561, 562-63 (Conn. 1937).

When construing the terms of a lease, Connecticut courts adhere to three fundamental principles:

> (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; [and] (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible.

LMK Enters., 860 A.2d at 1232. Additionally, the terms of the parties' agreements are given a reasonable construction to avoid inconsistences among them. See Regency Sav. Bank v. Westmark Partners, 756 A.2d 299, 302-03 (Conn. App. Ct. 2000). Here, the plain and unambiguous terms of the contracts at issue indicate that the Consent to Sublease is a conditional novation of the Lease.

Under Connecticut law, a novation is the substitution of a new obligation for an old one, which is thereby extinguished.[7] See Bushnell Plaza Dev. Corp. v. Fazzano, 460 A.2d 1311, 1314 (Conn. Super. Ct. 1983). "[A] novation of a lease

_____

[7]    Connecticut courts refer to an agreement in which a new party is introduced by a new contract as a "novation" and to an agreement between the same parties that supersedes a prior contract obligation as a "substitute contract." See Riverside Coal Co. v. Am. Coal Co., 139 A. 276, 277 (Conn. 1927). But the distinction is without legal effect. Id.

occurs when a new party is substituted as the tenant under the lease with the express agreement of the landlord; the effect of a novation is to release the initial tenant from liability under the lease." Riverdale Assocs., L.L.C. v. Tenny, No. 030193985S, 2003 WL 21958477, at *1 (Conn. Super. Ct. July 28, 2003) (citing Restatement (Second) of Contracts §§ 279, 280 (1981)).

If the terms of a second contract are "'inconsistent with the former contract, so that the two cannot stand together,'" there is a novation and the original, and now inconsistent, obligation is extinguished. See Bushnell Plaza Dev. Corp., 460 A.2d at 1314 (quoting Riverside Coal Co., 139 A. at 278 (holding that new contract altering price of goods and changing delivery destination constituted substitute contract that discharged obligations under original contract)).[8] "Separate dealings among the parties cannot affect another transaction so as to constitute a substituted contract between them unless it was their intention that such an agreement be consummated." Hess v. Dumouchel Paper Co., 225 A.2d 797, 800 (Conn. 1966). In determining the intent of the parties, the Court must consider

---

[8]     In Bushnell Plaza, a landlord sued a tenant for back rent and attorney's fees that were recoverable under a written lease between the parties. The written lease charged rent at $540 per month. But, upon the lease's expiration, the parties orally agreed to a monthly rent of $570 and a month-to-month term. Because of the inconsistency in the rent, the tenant's obligation under the written lease to pay attorney's fees was extinguished. Bushnell Plaza, 460 A.2d at 1314-15.

"the language used and the circumstances known to both parties under which the negotiations were had," and "[t]he contract must be read in the light of the whole relationship between the parties." Id. Therefore, as a threshold matter, the Court must determine whether the Consent to Sublease is a novation of the Lease.

Here, the Consent to Sublease provides,

> In the event of a termination of the Master Lease prior to the termination of the Sublease, the Sublease shall continue in full force and effect as a direct lease between Master Landlord . . . and Tenant, upon, and subject to, all of the terms, covenants and conditions of the Sublease for the balance of the term thereof remaining, including any extensions therein provided.

Consent to Sublease ¶ G. Parke Bank consented to the terms of the Blockbuster Sublease, a copy of which was attached to the Consent to Sublease as an exhibit. Id. ¶ D. Under the plain and unambiguous meaning of the Consent to Sublease, therefore, the Blockbuster Sublease would become a direct lease between Parke Bank, as landlord, and Blockbuster, as tenant, on the condition that the Blockbuster Sublease terminated after the Lease.

And the only reasonable interpretation of the Consent to Sublease is that the parties created a conditional novation. See 30 Richard A. Lord, Williston on Contracts § 76:38 (4th ed. 1990) ("Where the new agreement is conditional, it is possible that the parties agreed that on the happening of a condition

15

there should be a novation, and that until and unless the condition happened, the original obligation should remain in force."). [9] Here, Parke Bank stipulated to allow Blockbuster to continue using the Premises on the condition that the Blockbuster Sublease terminated after the Lease. [10] Parke Bank's asserted interpretation that Bank of America's restoration obligations remain despite the Blockbuster Sublease transforming into a direct lease is unreasonable and would create dramatic inconsistencies in the parties' agreements.

First, such an interpretation is unreasonable because requiring Bank of America to restore the Premises to a bank branch during Blockbuster's tenancy would violate Blockbuster's right to quiet enjoyment under the Blockbuster Sublease. In determining the intent of the parties to the Consent to Sublease, the Court considers the Blockbuster Sublease, which was attached to the Consent to Sublease. See Batter Bldg. Materials Co. v. Kirschner, 110 A.2d 464, 468 (Conn. 1954)

---

[9]      In other words, once the condition was satisfied——that is, the Lease terminated prior to the termination of the Blockbuster Sublease——the Blockbuster Sublease became a novation of the Lease.

[10]      Indeed, Parke Bank could have contracted that the Blockbuster Sublease would expire simultaneously with the Lease, which it attempted to do in an agreement to which Bank of America was not a party. See New Blockbuster Lease 1 ("[Parke Bank] and [Blockbuster] hereby agree that the [Blockbuster Sublease] expires as of the moment Bank of America's tenancy under the Lease expires . . . .").

("Where . . . the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties."). The Blockbuster Sublease provides that Blockbuster "shall and may peaceably and quietly have, hold and enjoy the [Premises] and improvements thereon during the Term of [the Blockbuster Sublease.]" Blockbuster Sublease art. 33(A). Bank of America could not have restored the Premises to a bank branch without directly violating Blockbuster's right to quiet enjoyment.[11] Thus, the Court must interpret the Consent to Sublease to avoid this contradiction.[12] See Regency Sav. Bank, 756 A.2d at 302-03.

---

[11]     Parke Bank indirectly recognized this during Mr. Pacitti's deposition. See Pacitti Dep. 188:14-19 ("But I did expect that Bank of America would have notified Blockbuster six months prior to get out so they could get in there and give them three months to find another location and three months to complete the building and return it in its original condition to me. That's what I expected."). Parke Bank's expectation, however, is not in accord with its intent as expressed in the written agreements at issue in this case.

[12]     For the same reason, Parke Bank's reliance on Bank of America's promise "to fully perform all obligations under the terms of [the Lease]" is unavailing. Blockbuster Sublease art. 5(D). Indeed, adopting Parke Bank's interpretation would indicate that Blockbuster entered into a sublease to engage in a retail video rental business only to allow Bank of America, before expiration of the sublease, to restore the Premises to a bank branch and necessarily foreclose Blockbuster's business. The Court must interpret these terms to avoid such an absurd result.

Furthermore, the Consent to Sublease cannot be read to save Bank of America's restoration obligation if the Blockbuster Sublease terminated after the Lease because the terms of the Consent to Sublease indicate that the parties intended for Blockbuster to remain in the Premises after the Lease expired. Indeed, if the Blockbuster Sublease terminated after the Lease, the parties agreed that the Blockbuster Sublease would become a direct lease between Parke Bank and Blockbuster. And the Blockbuster Sublease imposed separate and distinct restoration obligations on Blockbuster. See Blockbuster Sublease art. 24 (requiring that Blockbuster surrender Premises "broom clean, without any damage"). Requiring Bank of America to restore the Premises to a bank branch despite Blockbuster's right to use the Premises for its video rental business after expiration of the Lease would create a dramatic inconsistency in the terms of the parties' agreements.

Finally, Parke Bank's reliance on the Lease provision that "assignment or subletting shall in no way relieve [Bank of America] from any of its obligations and responsibilities under any of the terms and covenants of the Lease" is unavailing. Lease art. 13. While Parke Bank is correct that Bank of America's restoration obligation would survive despite Parke Bank's consent to a subtenancy, Parke Bank went far beyond merely providing its consent. In fact, Parke Bank freely agreed

18

that the Blockbuster Sublease would transform into a direct lease upon expiration of the Lease. Therefore, the clear and unambiguous terms of the relevant agreements indicate that the parties agreed that if the Lease terminated prior to the Blockbuster Sublease, there would be a novation of the Lease, which would thereby release Bank of America from its restoration obligation. See Bushnell Plaza Dev. Corp., 460 A.2d at 1314. The Court now considers whether that condition was satisfied.[13]

---

[13]      Without directly claiming duress, Parke Bank asserts that it executed the Consent to Sublease under "threat" of a lawsuit from Bank of America for withholding its consent to sublet. E.g., Pls.' Reply Mem. in Supp. of Mot. for Partial Summ. J. 8. Parke Bank also argues that Bank of America is "equitably estopped" from arguing that the Consent to Sublease transformed the Blockbuster Sublease into a direct lease because Mr. Pacitti relied on Bank of America's assertion that it would have been "unreasonable" for Parke Bank to withhold its consent to the Blockbuster Sublease. See supra note 2.

         Parke Bank's last-minute assertion of these claims is unavailing. Mr. Pacitti was represented by counsel throughout his real estate transactions. Pacitti Dep. 97:8-16. And Parke Bank has not shown how Bank of America's assertion that withholding consent would be "unreasonable" was false, misleading, or intended to induce action. See Celentano v. Oaks Condo. Ass'n, 830 A.2d 164, 186 (Conn. 2003) ("In Connecticut, the doctrine of equitable estoppel requires proof of two essential elements: First the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and second the other party must change its position in reliance on those facts, thereby incurring some injury." (internal quotation and editorial marks removed)). Therefore, Parke Bank falls far short of carrying its burden on a claim of equitable estoppel.

         Furthermore, Parke Bank now asserts that the Consent to Sublease violates an agreement between Parke Bank, Bank of

B.    Bank of America's Restoration Obligation

Finding that the Consent to Sublease is a conditional novation of the Lease, the Court must now determine whether the condition was met to excuse Bank of America's restoration obligation. The Blockbuster Sublease becomes a direct lease between Parke Bank and Blockbuster "[i]n the event of a termination of the [the Lease] prior to the termination of the Sublease." Consent to Sublease ¶ G. Because Bank of America's restoration obligation is dependent on whether the Blockbuster Sublease transformed into a direct lease, the Court must determine whether the Lease terminated prior to the Blockbuster Sublease.

The parties agree that the Lease terminated on July 9, 2010. And the Blockbuster Sublease was set to expire on July 31,

_____

America, and Meridian Bank (Parke Bank's mortgagor), which required that no provision of the Lease would be modified without the prior written consent of Meridian Bank. Assignment & Subordination Agreement § 4, Def.'s Mem. in Supp. of Resp. in Opp'n Ex. A. But Parke Bank's argument is misplaced. First, there is no evidence of record that Meridian Bank consented to two other amendments to the Lease. See Lease Amendment Nos. 1 & 2. And, for that matter, there is no evidence of record that Meridian Bank consented, as required, to the Consent to Sublease. See Assignment & Subordination Agreement § 5 (requiring consent of Meridian Bank wherever Parke Bank's consent is required in Lease). Thus, it would appear that the Assignment and Subordination was not followed by any of the parties, and, more importantly, does not reflect the parties' intent under the Consent to Sublease.

20

2010.[14] Therefore, the Lease was set to terminate prior to the

Blockbuster Sublease.

        Parke Bank, however, argues that the Blockbuster

Sublease expired on July 9, 2010, as agreed to by Parke Bank and

Blockbuster in the New Blockbuster Lease.[15] Nevertheless, for

purposes of determining whether the Lease terminated before the

---

[14]     The term of the Blockbuster Sublease commenced when
the Premises were "delivered to [Blockbuster], free of all
tenancies, in the condition set forth in Article 6" and
terminated at midnight on the last day of the thirteenth lease
year of the first full calendar month. Blockbuster Sublease art
1(A). Blockbuster accepted the premises, consistent with Article
6 of the Blockbuster Sublease, on July 28, 1997. See Letter from
Blockbuster Project Manager Thomas Maroney to Fleet National
Bank 1 (July 31, 1997), Def.'s Reply Mem. in Supp. of Mot. for
Summ. J. Ex. A. Bank of America and Blockbuster memorialized
these dates. See Agreement 1 ("Primary Term of the [Blockbuster
Sublease] shall expire on July 31, 2010."). And Parke Bank
confirmed the party's understanding. See Pacitti Dep. 147:7-12
("Q: Is it your understanding now that the [Blockbuster
Sublease] was set to expire on July 31, 2010? . . . A: That's
what they agreed to, yes."). The Blockbuster Sublease expired,
therefore, on July 31, 2010.

        Parke Bank now claims that Bank of America and
Blockbuster executed an ultra vires agreement to extend the term
of the Blockbuster Sublease. Nevertheless, the memorialization
of the term was required by the Blockbuster Sublease, to which
Parke Bank consented. See Blockbuster Sublease art. 1(A) ("[Bank
of America] and [Blockbuster] shall enter into a supplemental
agreement specifying the actual date for the expiration of the
Primary Term in accordance with the form attached hereto as
Exhibit 'G.'").

[15]     "[Blockbuster] and [Parke Bank] hereby agree that the
[Blockbuster Sublease] expires as of the moment Bank of
America's tenancy under the Lease expires and/or terminates on
July 9, 2010. New Blockbuster Lease § 1. Blockbuster and Parke
Bank agreed to a continued lease of the Premises "under the same
terms and conditions" as the Blockbuster Sublease, with certain
exceptions. Id. § 2.

Blockbuster Sublease, the agreement between Parke Bank and Blockbuster is ineffective.

Parke Bank and Blockbuster could not amend the Blockbuster Sublease before it became a direct lease. The Blockbuster Sublease expressly provides that it "may be amended or added to only by an agreement in writing signed by the parties hereto or their respective successors in interest." Blockbuster Sublease art. 54. Bank of America was not a signatory to the New Blockbuster Lease, which purportedly amends the term of the Blockbuster Sublease. Without Bank of America's consent, the Blockbuster Sublease could not be amended. Therefore, the New Blockbuster Lease did not amend the termination date and the Consent to Sublease is a novation of the Lease.[16]

---

[16]      Of course, at the moment the Lease expired, the Blockbuster Sublease became a direct lease between Parke Bank and Blockbuster. At that point, Parke Bank and Blockbuster could modify the terms of the sublease consistent with article fifty-four of the Blockbuster Sublease. But by then, Bank of America's restoration obligation was excused, which makes any modification between Parke Bank and Blockbuster irrelevant.

Furthermore, and for the sake of completeness, the Court notes that Parke Bank and Blockbuster's attempt to backdate the execution date of the New Blockbuster Lease, see supra note 4, cannot operate to adversely affect the rights of Bank of America. See 2 Richard A. Lord, Williston on Contracts § 6:61 (4th ed. 1990) ("Certainly, when the interests of third persons are involved, it is well settled that the fiction of relation back will not be adopted.").

V.    **CONCLUSION**

For the reasons set forth above, the Court will **deny** Plaintiffs' motion for partial summary judgment and **grant** Defendant's cross-motion for summary judgment. An appropriate order will follow.